---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

---

| | |
|---|---|
| SHEN ENGINEERING, INC, <br><br>      Plaintiff, <br><br><br>     v. <br><br> RICHARD BRIGHTON, an individual, d/b/a BRIGHTON ARCHITECTURAL GROUP, <br><br>      Defendant. | **MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COPYRIGHT INFRINGEMENT OR, IN THE ALTERNATIVE, UNJUST ENRICHMENT** <br><br> Case No. 2:22-cv-0624 <br><br> District Judge Ann Marie McIff Allen |

---

This action concerns the design and building of cabins in a proposed residential development in Kamas, Utah.  Now before the Court is Plaintiff Shen Engineering, Inc.'s ("Shen") Motion for Summary Judgment.[1]  Defendant Richard Brighton opposes Shen's Motion.[2]  Shen seeks summary judgment on alternative grounds.  First, Shen argues that Brighton has infringed on its copyright by using, without permission, structural engineering plans that Shen developed for certain model cabins in support of additional building permit applications and to build

---

[1]     (*See* Pl's Mot. for Summary Judgment, ECF No. 27 (the "Motion").)

[2]     (*See* Def's Opp'n to Pl's Mot. for Summary Judgment, ECF No. 30.)

many other cabins within the same residential complex.  Alternatively, Shen seeks summary judgment on its claim that Brighton was unjustly enriched when he used Shen's engineering plans in support of these permit applications and the subsequent builds of those cabins without paying Shen for each additional use.

The Court having reviewed the Motion, the parties' respective briefs and submissions, the relevant law, and having heard oral argument from counsel, GRANTS IN PART Plaintiff's Motion for the reasons set forth below.

## BACKGROUND

The quondam business relationship between Shen and Brighton began as a promising enterprise.  Brighton is an architect who created architectural designs for cabins to be built in "Thorn Creek," a residential subdivision within the High Star Ranch planned development in Kamas, Utah.[3]  Between August and October 2017, Brighton asked Shen—a firm Brighton had periodically worked with since 2012 on many designs—if it would create structural engineering plans (the "Plans") based on Brighton's designs for four unique model cabins.[4]  Shen agreed to do so.  There was no formal written contract drafted between the parties.[5]  The requests from

---

[3]   (*See* Opp'n, ECF No. 30, at 12 ¶3.)  For all ECF document page references the reference is to the pagination on ECF.

[4]   (*See id*. at 12 ¶5.)

[5]   (*See* Def's Appendix of Evidence ("Def's App'x"), ECF No. 30-1, Ex. 2 (the "Brighton Decl.") at ¶18; Def's App'x, ECF No. 30-1, Ex. 1 (the "Brighton Dep.") at 24:5–12; *see also* Def's Appx., ECF No. 30-1, Ex. 3 (the "Shen Dep.") at 30:8–11 ("Q.  Did you have a formal written contract with Mr. Brighton for the services that you would provide for the Thorn Creek development?  A.  No. I have emails.").)

Brighton came to Shen by email and Shen accepted the assignments and agreed to various fees for creating each of the Plans.[6]  Each of the four Plans had a different fee ranging from a low of $2,000 to a high of $3,000.[7]  Shen prepared the Plans[8] and Brighton paid Shen for each of them.[9]

Around October 2017, Brighton also asked Shen to create two "mirrored" engineering plans from two of the original four plans.[10]  Shen and Brighton agreed that Shen was to be paid 50% of its initial fee for each of these mirrored plans.[11]  Around September 2019 and around September 2020, Brighton asked Shen to create new engineering plans for two other model cabin designs and agreed to fees

---

[6]    (*See* Def's App'x, ECF No. 30-1, Ex. 4 at 37–41.)

[7]    (*See id.*; Opp'n, ECF No. 30, at 13 ¶9.)

[8]    (*See* Motion, Ex. A, ECF No. 27-1 (the "Shen Decl.") at Attachments 1–5.)

[9]    (*See* Def's App'x, ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶16; Def's Appx., ECF No. 30-1 at Ex. 8.)

[10]    The parties do not appear to fully agree on the total number of plans requested by Brighton and created by Shen.  Brighton asserts it was eight, claiming that it originally requested engineering plans for four designs and then requested four additional engineering plans—two of which were "mirrored" plans and two new plans.  (*See* Opp'n, ECF No. 30, at 12–13 ¶¶5–7; Def's App'x, ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶¶9–11.)  Shen, however, suggests that there may only have been seven plans.  (*See* Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶¶7–8; First Am. Compl., ECF No. 7, at ¶19; Motion, ECF No. 27, at 2 ¶¶2 & 6; *see also* Def's App'x., ECF No. 30-1, Ex. 3 (Shen Dep.) at 22:6–10 (testifying that Shen was hired to create five model cabins and two reuses for a total of "seven jobs").)  Invoices Shen apparently sent to Brighton dated April 2021 and September 2021, however, identify eight plans: the Wasatch Cabin, Unita Cabin, Gateway Cabin, Summit Cabin, Willow Cabin, and Sage Cabin Plans, and repeat uses of the Gateway Cabin and Summit Cabin plans.  (*See* Def's App'x, ECF No. 30-1, Ex. 8.)  More specific identification of the Plans created by Shen and used by Brighton may be required as this action proceeds.

[11]    (*See* Def's App'x, ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶11.)

for the same.[12]  There is no dispute that Shen had been paid in full for every one of the Plans it created for Brighton.[13]

 According to Shen, in late 2020 it learned that Brighton was using Shen's Plans in the building of multiple homes in the same development.[14]  On December 29, 2020, Shen contacted Brighton and specifically asked Brighton how many homes were built or will be built using its Plans, noting that "we had mentioned that for any repeat use of the models, we charge 50% of the original fee."[15]  Shen informed Brighton that it would "charge each repeat use of cabins as $1250."[16]  On January 11, 2021, Brighton initially responded that it would "need to count the # of repeats out there."[17]  Brighton did not challenge Shen's position that it was entitled to any repeat or reuse fees.

Over two months later, on March 23, 2021, Brighton informed Shen that there were "5 repeat cabins" and that "I will have to pay you out of my own pocket."[18]  Brighton also stated that "I did not have any understanding that you required a 50% repeat fee in your contract with me when we began the project," and

---

[12]    (*See* Def's App'x, ECF No. 30-1, at Exs. 6 & 7.)

[13]    (*See* Opp'n, ECF No. 30, at 13 ¶11; Def's App'x, ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶16; Def's Appx., ECF No. 30-1, at Ex. 8.)

[14]    (*See* Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶¶9–10 & Attachment 6.)

[15]    (*See id*.).

[16]    (*See id*.).

[17]    (*See id*.)

[18]    (*See id*.)

that "[h]ad I known, I could have negotiated something with the owner at that time or used a different engineer."[19]

Subsequently, on March 24, 2021, after receiving Brighton's message, Shen contacted Tom Grimmet, the builder of the cabins, and informed him that it had not been paid by Brighton for the repeat uses of its Plans.[20]   Grimmet responded that "this distresses me a lot" and that "[w]e have already paid [Brighton] your fees, but I think he is in a little financial trouble these days.  I'll see that you get paid one way or another.  Because of this and other issues, I'm going to find another architect."[21]

Later that day Grimmet emailed Brighton to let him know that Shen "informs me you have failed to pay him his repeat engineering fees" and advising Brighton that "I will be looking for another architect for our project."[22]  Brighton responded that:

> "I never had an agreement with Henry Shen on repeat fees.  He has been paid in full for all of his designs and now want's [sic] 50% of his original design fee for all repeat units for zero additional work on his part.  I am attempting to negotiate with [Shen] after the fact, but no other Engineer I have ever dealt with charges these kinds of fees."[23]

---

[19]     (*See id.*)

[20]     (*See id.*)

[21]     (*See id.*)

[22]     (*See* Def's App'x, ECF No. 30-1, at Ex. 12.)

[23]     (*See id.*)

Later that same day Shen emailed Brighton and Grimmet informing them that they "unlawfully used [Shen's] designs to pull permits on at least 23 out of 31 lots" and that "[Brighton] is trying to get the repeat use fees from the owners [i.e., Grimmet] and the owner feels that they have paid them," noting that "[t]here is some confusion between you two."[24]   Three days later, in response to this email, Brighton informed Shen that Grimmet's and Brighton's "attorneys are working on a global settlement with you."[25]   In an invoice dated April 2021, Shen demanded payment of $28,750 in repeat use fees.[26]   Brighton has not paid these fees.   Shen has also provided proof that Brighton was paid a fee of $5,000 for each of 31 repeat

---

[24]     (*See* Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶¶9–10 & Attachment 6.)

[25]     (*See id.*)

[26]     (*See* Def's App'x, ECF No. 30-1, at Ex. 8.)  Exhibit 8 also contains an invoice dated September 2021 that demands $41,250 in repeat use fees.  (*See id.*).  In its briefing, Shen offers no explanation for these different invoiced amounts.  And in its briefing, Shen claims fees of $36,650 based upon 31 repeat uses.  (*See* Motion, ECF No. 27, at 4 ¶20; Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶20).

uses of his designs for a total of $155,000.[27]  Shen further claims that each of these

repeat uses included Shen's Plans. [28]

In his deposition testimony, Brighton acknowledged that he never told Shen

how many times he intended to use each of Shen's Plans.[29]  He also never told Shen

the total number of building lots that were in the Thorn Creek subdivision.[30]

Brighton also admitted that he never informed Shen that he would use Shen's Plans

as many times as he wanted.[31]  And, consistent with his testimony, and perhaps

---

[27]     (*See* Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶19 & Attachment 13 (identifying 31 repeat uses with a "REPEAT FEE @ $5,000/UNIT").)  Brighton does not dispute the per unit amount of the fee.  He does claim that he had to perform additional work each time his design was reused and that his repeat fee was just 16% of his original fee.  (*See* Def's App'x, ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶¶30, 31.)  And although Brighton asserts that his repeat/reuse fees were negotiated and agreed upon by his clients "before work commences" (*see id.* ¶ 30), he has not provided any client agreements or other similar evidence to support this assertion.  In addition, while Brighton suggests that he has submitted proof of this additional work, the materials he cites—a series of emails dated from February 19, 2018, to February 20, 2019—at most suggest that Brighton may have done some additional work on only 5 of the 31 home sites that were repeat uses.  (*See* Def's App'x, ECF No. 30-1, Ex. 11 at 64–74 (noting possible additional work at lots 55, 60, 38, 39 and 25).)

[28]     (*See* Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶19; Motion, ECF No. 27 at 3 ¶12 (stating that each time a contractor needed a building permit for one of the homes Brighton would provide a copy of Shen's Plans).  Brighton has not denied this factual statement and admits that Shen's Plans were to accompany Brighton's designs for building permit purposes.  (*See* Opp'n, ECF No. 30, at 7 ¶12; *see also* Def's App'x, ECF No. 30-1, Ex. 1 (Brighton Dep.) at 44:20–46:10.)

[29]     (*See* Def's App'x, ECF No. 30-1, Ex. 1 (Brighton Dep.) at 26:7–11 ("Q. At any point in your communications with Mr. Shen, did you tell him how many times you intended to use each of his engineering packages that he provided you?  A.  No.").)

[30]     (*See id.* at 26:15–18 ("Q. Did you ever express to him the number of lots that were in the subdivision?  A.  Only that there were multiple lots. We didn't.").)

[31]     (*See id.* at 27:13–17 ("Q.  During your discussions with Shen Engineers, or Mr. Shen, did he inform you that you were free to use their structural drawings and other work as many times as you wanted?  A.  No.").)

most critically, Brighton admitted that Shen did not give him a license to make multiple uses of Shen's Plans.[32]  Brighton further confirmed that Shen never told him that Brighton could use Shen's Plans for more than one house without paying repeat/reuse fees.  Indeed, Brighton testified "[i]t was never discussed."[33]

Shen, however, testified that in October of 2017, when the request to create mirrored plans came up, it told Brighton that "50 percent of reuse fee needs to be applied."[34]  Further, Shen has presented evidence that it requested and/or was paid repeat/reuse fees for its structural engineering plans by other architects on other projects.[35]

Shen obtained copyright registrations for its Plans, each with an effective date of registration of August 24, 2022.[36]  Shen subsequently initiated this action on

---

[32]    (*See id*. at 43:8–14 ("Q.  Did Mr. Shen give you a license to make multiple uses of each of the engineering -- structural engineering packages that he did for you?  MR. AYCOCK: Objection. Calls for a legal opinion. Lacks foundation. THE WITNESS [Brighton]: No.").)

[33]    (*See id*. at 77:8–13; *see also* Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶18 ("At no time have I (acting as Shen or otherwise) ever told Mr. Brighton that he could use Shen Engineers, Inc.'s engineering plans for more than one house without notifying us and paying an appropriate reuse fee.").)

[34]    (*See* Def's App'x., ECF No. 30-1, Ex. 3 (Shen Dep.) at 35:21–36:3.)

[35]    (*See* Def's App'x, ECF No. 30-1, Ex. 16 [Resp. to Interrog. No. 1] (identifying four architecture firms other than Brighton that have paid Shen reuse fees); *see also id*. Ex. 17 at 93–96 (identifying reuse fees of 50%).)

[36]    (*See* Motion, Ex. A., ECF No. 27-1, at Attachments 7–12.)  Brighton admits that Shen has obtained copyright registrations for his Plans (*see* Opp'n, ECF No. 30, at 7) and in opposition to the Motion he has not challenged the validity of Shen's copyrights. Although Brighton suggests that Shen's works may not have been original (*see* Opp'n, ECF No. 30, at 7,) he does not present any such legal such argument in his Opposition.

September 22, 2022, and filed an amended complaint on October 24, 2022.  In its amended complaint, Shen asserts four claims:  (1) copyright infringement; (2) false endorsement; (3) breach of contract; and (4) unjust enrichment.[37]  Shen's Motion only seeks summary judgment on the copyright infringement and unjust enrichment claims.

<u>LEGAL STANDARDS</u>

Summary judgment may be granted when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once that initial burden has been met the non-moving party must demonstrate the existence of specific material facts in dispute to survive summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th 2013) (citations omitted).  An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, the court views "the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."  *Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008)

---

[37]     (*See* First Am. Compl., ECF No. 7.)

(citation omitted).  Despite this indulgence, the nonmoving party must nevertheless "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257.  "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (*citing Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).  The mere existence of a scintilla of evidence in support of the nonmoving party's case is insufficient. *Anderson*, 477 U.S. at 252.  And the nonmoving party's evidence must be more than "'mere reargument of [his] case or a denial of an opponent's allegation' or it will be disregarded." *See Millennium, Inc. v. Sai Denver M, Inc.*, No. 14-cv-01118, 2015 WL 1816479, at *3 (D. Colo. Apr. 20, 2015) (quoting 10B Charles Alan Wright, *et al.*, Federal Practice and Procedure § 2738 at 356 (3d ed.1998)).  Further, the court is not obligated to comb the record in order to make a party's arguments. *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th 2000).  Ultimately, a summary judgment determination depends on whether, given the evidence presented, "a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Anderson*, 477 U.S. at 254.

Turning to the substantive law, it is undisputed that the Copyright Act extends it protections to architectural plans and technical engineering plans. *See* 17 U.S.C. § 101 (specifically defining "architectural work" as "the design of a

building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings"); *Schuchart & Assocs., Pro. Eng'rs, Inc. v. Solo Serve Corp.*, 540 F. Supp. 928, 943 (W.D. Tex. 1982) ("Architectural and engineering drawings fall within the subject matter of copyright.") (citation omitted).  To establish a prima facie claim for copyright infringement, the plaintiff must establish that it owns a valid copyright and that the defendant engaged in an unauthorized copying or use of the protected work.  *See Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002);  *see also LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1156 (9th Cir. 2006).  The existence of an implied nonexclusive license, however, will serve as an affirmative defense to a claim of copyright infringement.  *See Nelson-Salabes*, 284 F.3d at 514.

The alleged copyright infringer bears the burden of establishing that it has an implied license.  *See Xtomic, LLC v. Active Release Techniques, LLC*, 460 F. Supp. 3d 1147, 1154 (D. Colo. 2020).  An implied licenses may be given orally or implied from conduct.  *See id.* at 1152 (citation omitted).  But even where the existence of an implied licenses has been established, the licensee will still be liable for infringement if he has exceeded the scope of the license granted.  *See LGS Architects*, 434 F.3d at 1156 (citation omitted).  The copyright holder, however, bears the burden of proving that the defendant's use of a copyrighted work exceeded the scope of license that was granted.  *See Boatman v. U.S. Racquetball Ass'n*, 33 F. Supp. 3d 1264, 1271 (D. Colo. 2014).

ANALYSIS

In opposition to Shen's Motion, Brighton argues that because it had a license to use Shen's Plans it cannot be liable under any copyright infringement theory. Brighton claims that Shen granted Brighton a license to use the Plans, not only to build the model cabins, but also to build multiple cabins in the same subdivision. Although Brighton acknowledges that he did not expressly inform Shen that he would use Shen's Plans multiple times, Brighton claims that multiple uses were implied because Shen knew (or should have known) that the Plans for the model cabins were for use in a development where the entire premise is that multiple cabins would be built, and that it is generally understood in the industry that any plans designed for a model home would also be used "for as many of those same model designs as are purchased by the home buyers."[38]

Brighton also argues that when Shen agreed to create the Plans and delivered the Plans to Brighton it never limited the scope of Brighton's use of the Plans to a single use or to the payment of a repeat or reuse fee for additional uses. Brighton posits that if Shen wanted to prohibit any reuses, it was incumbent on Shen to restrict Brighton's ability to make copies of the Plans or provide some notice to Brighton of the limited scope of the license.

---

[38]   (Def's App'x, ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶20; *see* Opp'n, ECF No. 30, at 21–22.)

Shen responds that there is no factual support to establish that it granted a multiple use license to Brighton.  Among other things, Shen argues that the only writings referencing the creation of the Plans speak to the creation of structural engineering plans for a singular house or cabin.[39]  Moreover, Shen notes that Brighton admitted in his deposition that: (1) he never disclosed to Shen how many times he intended to use Shen's Plans or the number of lots that were available; (2) Shen never told him he could use the Plans as many times as he wanted; and (3) Shen did not give him a license to make multiple uses of the Plans.[40]

## A.  *Did Shen Grant a License to Brighton*

It is undisputed that there was never any formal written contract between Shen and Brighton concerning the creation of the Plans or their subsequent use.  Nevertheless, an implied license can arise from an oral agreement or the conduct of the parties.[41]  *See Xtomic*, 460 F. Supp. 3d at 1152.  Although the Tenth Circuit has

---

[39]    (*See* Pl's Reply, ECF No. 32, at 10; *see also* Def's App'x, ECF 30-1, Ex. 4 at 37 (noting "a fee of $2000 **for the house**") (emphasis added).)

[40]    (*See* Pl's Reply, ECF No. 32, at 10.; *see also* Def's App'x, ECF 30-1, Ex. 1 (Brighton Dep.) at 26:7–11; 26:15–18, 27:13–17, 43:8–14.)

[41]    Brighton has characterized the license it purchased from Shen as an "exclusive" license.  (*See* Opp'n, ECF No. 30, at 3, 18, 19 ("Brighton on the other hand contends that the parties' agreement is an exclusive unlimited use license.")  Exclusive licenses, however, may only be granted in writing.  *See* 17 U.S.C. § 204(a) ("A transfer of copyright ownership … is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed"); *I.A.E. Inc. v. Shaver*, 74 F.3d 768, 774-76 (7th Cir. 1996).  There is no such writing here.  If any such license was granted in this case it must be an implied nonexclusive license, which does not require a writing and "simply permits the use of a copyrighted work in a particular manner."  *Shaver*, 74 F.3d at 775.  Whether such a license was granted and the manner in which Shen's Plans could be used under that license is what is at issue in this action.  If Brighton intends to rely on the existence of exclusive license the lack of a signed written

not yet ruled on how an implied license can arise, several other courts of appeal have done so.  The approach first applied by the Ninth Circuit in *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) and more recently in *Nelson-Salabes, Inc. v. Morningside Development, LLC*, 284 F.3d 505 (4th Cir. 2002) has been adopted by many other circuits[42] and has been applied by district courts within the Tenth Circuit.[43]

Under this approach, these courts suggest that an implied license results when:  (1) a person (the licensee) requests the creation of a work; (2) the copyright owner (the licensor ) creates that work and delivers it to the licensee; and (3) the copyright owner intends that the licensee copy and distribute the work.  *See Effects*, 908 F.2d at 558–59; *Nelson-Salabes*, 284 F.3d at 514; *Xtomic*, 460 F. Supp. 3d at 1152.

Applying those factors here, it is undisputed that the first two factors have been satisfied:  Brighton asked Shen to create the Plans and Shen created the Plans and delivered them to Brighton.  Nor is there any real debate that the third factor has been met.  Indeed, Shen admits that Brighton had permission to make copies of

---

license from Shen would appear to foreclose his defense to Shen's copyright infringement claim.

[42]    *See Atkins v. Fischer*, 331 F.3d 988, 991-92 (D.C. Cir. 2003); *John G. Danielson, Inc. v. Winchester-Contant Properties, Inc.*, 322 F.3d 26, 40–42 (1st Cir. 2003); *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 879 (5th Cir. 1997); *Shaver*, 74 F.3d at 774-76.

[43]    *See Oliver v. Meow Wolf, Inc.*, No. CV 20-237, 2023 WL 4054537, at *7 (D.N.M. June 16, 2023); Xtomic,* 460 F. Supp. 3d at 1154.

its Plans insofar as needed to build the specific model cabins.[44]   And Brighton's

testimony confirms that Shen allowed Brighton to make multiple copies of Shen's

Plans to get permits to build the specific model homes.[45]

This record establishes that Brighton had an implied nonexclusive license to

use and copy Shen's Plans.  Thus, a determination as to whether Brighton is liable

for copyright infringement turns on whether Brighton's uses of Shen's Plans were

within the scope of that license.

### B. Was Brighton's Use / Reuse of the Plans Outside the Scope of the Implied License

An implied license only protects Brighton from an infringement claim if

Brighton used the Plans as Shen intended.  If Brighton used the Plans outside that

scope, he is liable for copyright infringement.  *See LGS Architects*, 434 F.3d at 1156.

Shen, as the copyright holder, bears the burden of demonstrating the scope of

the license.  In arguing that the scope was limited to using the Plans only in

connection with the specific model cabins (and not any other reuses), Shen relies in

part on the fact that when it was asked to create two mirrored plans it informed

---

[44]   (*See* Def's Appx., ECF 30-1, Ex. 3 (Shen Dep.) at 62:21–24 (acknowledging that Shen had "no problem" if a contractor "made copies of your plans – **to build one house**, made multiple copies of your plans") (emphasis added).)

[45]   (*See id.*, Ex. 1 (Brighton Dep.) at 44:25–45:3 ("I paid Mr. Shen for the design of the four different unit types, and we made multiple copies of those packages for building permit purposes at the City of Kamas."); *see id.*, Ex. 2 (Brighton Decl.) at ¶22 ("In a subdivision project like Thorn Creek, it is understood that numerous copies of architectural plans, including associated engineering plans, are required to be made. These copies are used to accomplish the construction of the various **model homes**.") (emphasis added).)

Brighton that it required an additional fee of 50% to create those plans.  Shen

asserts that this establishes that a repeat/reuse fee was required for any additional

uses of the Plans.

Brighton disputes that Shen's creation and delivery of a "mirrored" plan is a

"reuse" of a plan.  Brighton notes that these separate plans were not reuses but

"additional or supplementary work" that Brighton requested from Shen and for

which Shen was paid in full.[46]  And although Shen disputes the amount of work it

was required to perform to create these additional plans,[47] it does not challenge that

it did some additional work, created new plans, and was paid for its efforts following

delivery of these plans.  And Brighton has testified that a reuse "didn't require Shen

making changes or being involved in it in any way."[48]  Brighton also claims that

Shen never expressed any reuse limitation to him at the time the Plans were first

created.[49]  And while Shen acknowledges that it wasn't until the issue of the

---

[46]     (*See* Opp'n, ECF No. 30, at 3; *see also* Def's App'x, ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶12 (explaining that "[a] mirrored plan is not a 'reuse.' Mirrored plans take a home's structural engineering calculations and flips it over an axis to create the construction documents with a new arrangement.  Reuses take a plan's exact same calculations and construction documents with no changes").)

[47]     (*See* Motion, Ex. A., ECF No. 27-1 (Shen Decl.) at ¶8 (asserting that "it takes less than 5 additional minutes of my time to mirror the drawings in my software program").)

[48]     (*See* Def's App'x, ECF 30-1, Ex. 1 (Brighton Dep.) at 67:20–68:4).)

[49]     (*See* Def's App'x, ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶24.)

mirrored plans came up in October 2017 that he "talked" about reuse with Brighton,[50] that discussion was before Brighton's reuses began.

Brighton asserts that he was never informed that he needed any permission from Shen to use the Plans for buildings outside the four initial model homes, or informed that Shen would require the payment of a reuse fee for any other uses. Shen disputes these assertions.  Among other things, Shen states that at no time did it inform Brighton that he could use the Plans for more than one cabin without notifying Shen and paying a reuse fee.[51]  Shen also states that it does not allow its clients to simply copy its engineering plans and use them on other buildings.[52] Rather, according to Shen, it requires all of its clients to inform it of any intended reuse of its engineering plans so that Shen can provide an updated set of plans that identify the location of the additional building.[53]  Shen further confirmed that it does so because it is important that it is aware of any additional liability that may attach to any such use.[54]

---

[50]     (*See* Def's App'x, ECF No. 30-1, Ex. 3 (Shen Dep.) at 65:23–66:2, 85:13–17 (testifying that Shen never talked to Brighton about any reuse or reuse fee before October 2017 when the mirrored plans were requested).)

[51]     (*See* Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶18  ("At no time have I (acting as Shen or otherwise) ever told Mr. Brighton that he could use Shen Engineers, Inc.'s engineering plans for more than one house without notifying us and paying an appropriate reuse fee.").)

[52]     (*See id.* at ¶4.)

[53]     (*See id.*)

[54]     (*See id.*)

Shen has also testified that at the time it created the Plans it never talked with Brighton to allow Brighton to use the Plans for reuses.[55]  Further, the first email from Shen to Brighton regarding the work confirms a limited use.  In his email dated August 4, 2017, Shen expressly informed Brighton that it "would propose a fee of $2000 <u>for the house</u>."[56]  As Shen explained to Brighton, it was for one "house," not multiple homes.[57]

The record also evidences that when reuses were contemplated, Shen charged a reuse fee.  For example, during Shen's deposition Brighton's counsel questioned Shen about a June 27, 2019, email with Otto/Walker architects in which Shen requested a 50% reuse fee on a project.  Shen testified that it created two model home plans for Otto/Walker and was paid a 50% fee for each of the twenty other homes that Otto/Walker built in the same project using Shen's plans.[58]

---

[55]  (*See* Def's App'x, ECF No. 30-1, Ex. 3 (Shen Dep.) at 61:3–11 (testifying that Shen never talked to Brighton about allowing him "to make photocopies for multiple use, for reuse")

[56]  (*See id*. at Ex. 4 at 37(emphasis added).)

[57]  Brighton comes close to acknowledging this express limitation when in his declaration he states that copies of the plans were to be used to "accomplish the construction of the various model homes."  (*See id*. Ex. 2 (Brighton Decl.) at ¶22.)  Brighton does not reference the construction of any homes other than the "model" homes, which is entirely consistent with Shen's expressed view its Plans were for use on the specific model homes and not for all the other homes that were to be built in the subdivision.

[58]  (*See id*. at 58:11–24.)  Although a copy of this email exchange was not presented to the Court, the discussion of this email in Shen's deposition—a discussion prompted by Brighton's counsel—supports Shen's argument that its practice was that any reuse by a client, including Brighton, was contingent on the payment of a reuse fee.  *See also Schuchart & Assocs. v. Solo Serve Corp.*, No. SA-81-CA-5, 1983 WL 1147, at *23 (W.D. Tex. June 28, 1983) (recognizing that it is "the practice in the architectural and engineering

Further, the Court notes that in December 2020, when Shen first raised the reuse fee issue with Brighton, Brighton did not reject Shen's demand for a reuse fee or the size of the fee, but rather informed Shen that it first needed "to count the # of repeats out there."[59]  And more than two months later, when Brighton got back to Shen, he again did not deny that he owed Shen any reuse fee but instead claimed that the "owner is unwilling to pay for it because it has no contract with you. I will have to pay you out of my pocket."[60]  Brighton did, however, state that he "did not have an understanding that you required a 50% repeat fee in your contract with me when we began the project."[61]  Nevertheless, Brighton  acknowledged that he owed reuse fees to Shen and informed it that "I will get you paid on my next billing cycle in April."[62]

Despite this conduct, at oral argument Brighton's counsel emphasized that the scope of the implied license allowed Brighton to use Shen's Plans as often as he wished without any fee.  Counsel relied primarily on his assertion Shen was aware that Plans it created were for homes to be built in a "subdivision."[63]  To Brighton,

---

professions of paying a fee for the privilege of duplicating another professional's plans and specifications in the construction of a new building").

[59]     (*See* Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at Attachment 6 at 63.)

[60]     (*See id.* at Attachment 6 at 64.)

[61]     (*See id*.)

[62]     (*See id*.)

[63]     Brighton also proffered this argument in his Opposition brief.  (*See, e.g.*, Opp'n, ECF No. 30, at 4, 7, 22.)

the invocation of "subdivision" converted what was an implied license to use Shen's Plans in connection with the four identified model homes into an implied license to use Shen's Plans on virtually every home that could conceivably be built within the subdivision.  This alchemy applied because, according to Brighton, it was "industry" understanding that a plan submitted for even a single home in a "subdivision" could be used for every home lot in the subdivision unless an express limitation on such use was given in writing.  To support this "industry" understanding, Brighton did not present any evidence other than his own declaration.  He presented no expert evidence on this industry understanding or present any other evidence to support his self-serving view.[64]

In *Wood v. Houghton Mifflin Harcourt Publishing Co.*, 589 F. Supp. 2d 1230 (D. Colo. 2008), the court rejected the use of similar testimony as a means to create a genuine issue of material fact as to the scope of certain licenses.  In *Wood* the court rejected the view of an executive of the defendant who testified that it was "industry convention" that an express limitation on making "under 40,000" copies

---

[64]     At oral argument (but not in his opposition brief) Brighton's counsel suggested that Shen built the potential for multiple reuses into his initial fees for the Plans.  But there is no record support for this assertion.  Shen charged, at most, $3,000 to create a structural plan.  As Brighton points out, this was a potential 62-lot subdivision.  To suggest that Shen's initial $3,000 fee was also intended to cover every potential reuse in the subdivision would suggest that Shen valued each use at approximately $48.  Such a view is nonsensical and not supported by any evidence in the record.  To the contrary, when examined in this light, this analysis confirms that the scope of the license was limited to just the one model home and that no reasonable jury could return a verdict for Brighton that the implied license included all 62 potential reuses.

actually included permission to make more than 40,000 copies and to reproduce as many copies as the publisher desired. *Id*. at 1242.  Noting the defendant did not present any expert testimony on this industry usage but instead relied on the "self-serving deposition testimony" of its own executive, and because this interpretation appeared to be nonsense, the court concluded that the defendant failed to present evidence that the scope of the license was genuinely in dispute. *Id*. at 1241–42.

The same holds true here.  Just like in *Wood*, Brighton only offered his self-serving testimony as to this industry understanding that engineering or architectural plans developed for use on a particular home in a subdivision will also be used for as many homes as are built in the subdivision.[65]  No other evidence has been presented to support this testimony.  To the contrary, an email from Tom Grimmet—the builder of homes in the subdivision—establishes just the opposite: that Shen is entitled to reuse fees for each reuse.[66]

Nor does Brighton's industry standard argument accord with Brighton's own practices or the other evidence presented.  It is undisputed that Brighton received substantial reuse fees of $5,000 for each reuse of his architectural plans.[67]  And it is

---

[65]    (*See* Def's App'x., ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶ 20.)

[66]    (*See* Motion, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶¶9–10 & Attachment 6 (following notification from Shen that it had not been paid any reuse fees by Brighton, Grimmet responded "this distresses me a lot" and that "[w]e have already paid [Brighton] your fees, but I think he is in a little financial trouble these days.  I'll see that you get paid one way or another.").)

[67]    (*See* Def's App'x., ECF No. 30-1, Ex. 10 at 60, 62.)

undisputed that Shen was paid reuse fees, and it appears that others in the industry (including Brighton) acknowledged that Shen was entitled to be paid for reuses.[68]  If the industry understanding was that architectural and engineering plans used in a subdivision, in Brighton's own words, "will be used for as many of those same model designs as are purchased by the home buyers,"[69] why were Brighton and Shen entitled to recover any reuse fees?  And, more important, why would anyone pay them any reuse fees in this context?[70]  While credibility is not to be considered in evaluating a motion for summary judgment, Brighton's self-serving speculative statement on this issue—the only "evidence" he has to offer—is not sufficiently probative or reliable enough to defeat summary judgment.  *See Wood*, 589 F. Supp. 2d at 1241–42; *see also Anderson*, 477 U.S. at 257 (noting that the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment).

Even if Brighton could establish his "industry" understanding argument, the record fails to establish that Shen knew of the scope of the "subdivision."  Brighton

---

[68]     For example, when Shen discovered Brighton's reuses and confronted Brighton, Brighton replied via email that he had to quantify the number of reuses and that he would have to pay Shen "out of my pocket," and that he would get Shen paid on his "next billing cycle."  (*See* Motion, Ex. A. (Shen Decl.) at Attachment 6 at 63–64.)

[69]     (See Def's App'x., ECF No. 30-1, Ex. 2 (Brighton Decl.) at ¶ 20.)

[70]     Of course, Brighton posits that he and Shen were entitled to these fees because they requested them up front.  But if, as Brighton claims, the industry understanding was that no such fee is to be paid why would others in the industry agree to pay any reuse fees.  Brighton's self-serving conjecture is simply not competent evidence to support such a claim.

argued that Shen was aware of multiple uses because Shen received emails that identified various lot numbers for some of the cabins.[71]  But these emails only identify four lots—which is consistent with Shen's position that the license was only for four homes—and nowhere indicate that Shen's Plans would be used on as many as 31 additional lots.  There also remains an open question as to whether these lot numbers represent the actual sites on which the four model homes or the two mirrored cabins for which Shen created the Plans were to be built.[72]  Moreover, these emails were sent in November 2017 approximately one month after Shen informed Brighton about reuse fees in October 2017.[73]  To put it bluntly, no reasonable jury could find that these emails support Brighton's argument that Brighton was given a license to use Shen's Plans for more than the original homes.

Brighton also argues that the fact that Shen did not place any express written limitation on its Plans creates a genuine issue of material fact as to the scope of the implied license.[74]  For this position Brighton turns to *Wood v.*

---

[71]     (*See* Def's App'x, ECF No. 30-1, Ex. 9 at 56–58.)

[72]     Although at oral argument, Shen's counsel was unable to recall whether the referenced lot numbers corresponded to the exact lots on which the original or mirrored homes were to be built, the record reveals that lot numbers 51 and 53 are for the mirrored lots.  (*See* Def's App'x, ECF No. 30-1, Ex. 14 at 81–83 (identifying the structural plans for lots 51 and 53 as the "mirrored" plans).)

[73]     (*See* Def's App'x., ECF No. 30-1, Ex. 3 (Shen Dep.) at 35:21–36:3.)

[74]     In advancing this position at oral argument, Brighton's counsel offered up an analogy.  Asserting that he baked an excellent rhubarb and strawberry pie, counsel explained:

> If I give you that pie and just gave it you and said, "Here you go Your Honor," and then left and didn't say anything else, what would the court think could be done

*Houghton,* 589 F.Supp.2d at 1239–40, in which the court partially denied plaintiff's summary judgment motion noting that fact issues remained as to the scope of two of the eight licenses in dispute because the two licenses did not contain any limiting language.

*Wood* doesn't help Brighton. First, the licenses in Wood were written licenses. There is no written license or written contract between Brighton and Shen, so any perceived requirement that Shen should have (or even could have) informed Brighton in such a writing as to any limitation on the use of its Plans is inapplicable. Nor does it appear that the actual photos copied in *Wood* had any notations on the photos themselves that limited their reuse. And, as Shen's counsel correctly asserted at oral argument, since March 1989, there is no requirement to put any notice on a copyrighted work.[75]

---

> with that pie—right eat it. And then I come back later, and say, "Oh no, I just intended for you to enjoy the smell and beauty of it because it is beautiful." That's very similar. Yes, I can't make reproductions of the pie, but the point is once you are given that without any restrictions or limitations what is Mr. Brighton to believe that he can do with it?"

(August 15, 2024, Oral Argument at 2:26 p.m., *see* ECF No. 37 Minute Entry.) This analogy doesn't help Brighton because Brighton in this case actually made reproduction—he reused Shen's Plans to build 31 additional cabins without authorization. The more apt analogy here is as follows: Assume counsel gave the Court his rhubarb pie without any express limiting language. Then assume that the Court took the pie and ate one slice, but then offered the pie up to others who then used the pie to create a recipe to bake dozens and dozens of more pies, which were then sold for profit. While it may have been objectively reasonable for the Court to understand it could eat a slice, as counsel suggests, it would be an objectively unreasonable understanding for the Court to believe that its receipt of the pie entitled the Court to allow others to use that pie to create more pies and turn a profit. That's more like what happened with Shen's Plans here.

[75] Effective March 1, 1989, the Copyright Act was amended by the Berne Convention Implementation Act of 1988, under which the placement of any copyright notice on the

Essentially then Brighton's scope argument is that because he and Shen did not discuss any limitations, it should be presumed that the license granted Brighton as broad a use as he wanted.  In *Thomas M. Gilbert Architects, P.C. v. Accent Builders And Devs., LLC*, 377 F. App'x 303, 308 (4th Cir. 2010) (unpublished), however, the court rejected a similar position.  In *Thomas*, the defendant argued that he was permitted to modify and reuse architectural plans without informing the plaintiff or paying the plaintiff a fee because there was nothing express in the parties' agreement that forbade him from doing so.  *Id*.  In granting summary judgment on the copyright infringement claim, the court noted that defendant assumed "wrongly" that a broad implied license is presumed in contracts for architectural plans.  *Id*.  The same holds here.[76]  And Brighton has not offered any competent proof to support a contrary view.

Further, Brighton wholly ignores his concessions in the action.  He admitted that he never told Shen how many times he intended to use Shen's Plans.[77]  He admitted that he never informed Shen of the total number of lots in the

---

work itself became optional rather than mandatory.  *See TransWestern Pub. Co. LP v. Multimedia Mktg. Assocs., Inc.*, 133 F.3d 773, 781 (10th Cir. 1998); 17 U.S.C. § 401(a) ("Whenever a work protected under this title … a notice of copyright as provided by this section *may be placed* on publicly distributed copies …") (emphasis added).  Thus, to the extent that Brighton argues that Shen's motion must be denied because Shen did include any copyright notation or use limitation on its Plans (*see* Opp'n ECF No. 30, at 16 ¶25), that argument is unavailing.

[76]     And even if it did, such a presumption would not trump the course of conduct and other record support that Shen has identified.

[77]     (See Def's App'x, ECF 30-1, Ex. 1 (Brighton Dep.) at 26:7–11.); 26:15–18, 27:13–17, 43:8–14.)

subdivision.[78]  And he admitted that Shen never gave him a license to make

multiple uses of the Plans.[79]  Given these admissions, the absence of any written

limitation is of no consequence.  Indeed, in *Xtomic*—even without the type of

damning admissions present here—the court rejected the defendant's argument

that the plaintiff's failure to include a specific limitation on what the defendant

could do with the copyrighted work gave the defendant an implied license to do

anything he wished with the works without restriction.  *See Xtomic*, 460 F. Supp. 3d

at 1154.

When this record is examined in its totality and given Brighton's failure to

identify any objective evidence that indicated that he could reuse Shen's Plans on

every home in the subdivision, it appears that there is no genuine dispute that,

under the license Shen granted to Brighton, Brighton's use of the Plans was limited

to the original model homes and the mirrored homes and that Shen should have

been paid for any additional uses.

As noted above, Shen testified that was its practice.  Shen also testified that

when it created the Plans for Brighton it believed Brighton was only entitled to use

each plan for just one cabin.[80]  Shen also presented other agreements in which such

---

[78]  (*See id.* at 26:15–18.)

[79]  (*See id.* at 43:8–14.)

[80]  (*See* Def's App'x, ECF No. 30-1, Ex. 3 (Shen Dep.) at 59:5–7 (Q.  When you provided plans to Mr. Brighton, what did you believe he was entitled to do with them?  A.  For one house.  One design for one house.").)

a reuse fee was requested and collected.  Further, Shen had, in fact, asked for and received a reuse fee of 50% from Brighton when Brighton sought a mirrored plan, years before Shen was made aware of Brighton's reuses.  And, perhaps most telling, when Shen reached out to Brighton after Shen became aware that Brighton was reusing Shen's Plans on other homes, Brighton did not deny that it owed any reuse fees but informed Shen it had to first calculate the number of reuses, and then informed Shen that it would pay the reuse fee "out of [his] own pocket" and that he would "get [Shen] paid on my next billing cycle."  Thus, by using Shen's Plans on multiple homes and without compensating Shen, Brighton exceeded the scope of the implied license.  *See Xtomic*, 460 F. Supp. 3d at 1154 (recognizing that the parties' course of conduct can demonstrate the scope of an implied license and that the "parties actions spoke as loudly as words"); *see also LGS Architects*, 434 F.3d at 1156-57 (recognizing that where a license limited the use of architectural plans to building a specific project the scope of that license was exceeded when the plans were used to build homes in another project); *Donald A. Gardner Architects, Inc. v. Cambridge Builders, Inc.*, 803 F. Supp. 2d 373, 380-81 (E.D.N.C. 2011) (concluding that scope of license was exceeded where defendant received a license to "construct only one building" but used the plans to build multiple structures).  No reasonable jury could find otherwise.

Accordingly, because Brighton's multiple reuses of Shen's Plans exceeded the scope of any implied license, Brighton is liable for copyright infringement and,

therefore, Shen's Motion on its infringement claim will be granted as to liability only.[81]

### C. Shen's Claim for Unjust Enrichment

Shen has alternatively asked for summary judgment on its unjust enrichment claim. Even assuming Brighton had an implied license, Shen argues that Brighton has been unjustly enriched by his undisclosed reuses of the Plans without any payment to Shen.

To prove its unjust enrichment claim, Shen must establish three elements: (1) that it conferred a benefit upon Brighton; (2) that Brighton appreciated or had knowledge of the benefit; and (3) that Brighton retained this benefit under circumstances that would make it inequitable for Brighton to retain the benefit without paying Shen its value. *See Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, ¶ 13, 12 P.3d 580, 582 (Utah 2000).

Brighton does not challenge that Shen has established the first two of these elements. Instead, Brighton's Opposition is based on its view that there is no "inequity in Brighton retaining the compensation which he received."[82] Brighton bases this argument on its claim that Shen is not entitled to any compensation for any reuses of its Plans because "Shen did not have any increased liability with his

---

[81]   Shen has not moved for summary judgment as to damages.

[82]   (*See* Opp'n, ECF No. 30, at 24.)

Plans being reused on the Project."[83]  Brighton's argument relies on his statement that he maintains an insurance policy for each project that also covers each of its subcontractors, including Shen.[84]  But Brighton has not produced a copy of this policy, so the Court is not in any position to determine if the policy protected Shen for any reuse of its Plans or the scope of the protection available to Shen.

Brighton also argues that Shen has admitted it has not even informed its own insurance company of any potential liability from Brighton's reuses of its Plans.[85]  While that appears to be the case, Brighton cites no authority nor offers any compelling rationale why this fact would serve as a defense to Shen's unjust enrichment claim.

Brighton further argues that the work he performed on the reuses justified the $5,000 fee he was paid so that he was not "unjustly" enriched.[86]  He was paid this fee, Brighton claims, because reusing his architectural designs on additional homes required additional work from him, such as "continuous observation" of the construction of each home built, facilitating the construction with the developer, contractor, and the buyer to ensure that the designs were properly implemented, and "creating new site plans and title blocks, grade, adjust elevation and materials,

---

[83]     (*See id.* at 25.)

[84]     (*See id.*)

[85]     (*See id.*)

[86]     (*See id.* at 25–26.)

and make any other interior modifications based on the feedback from the home buyer."[87]

Shen does not challenge Brighton's assertions that he performed additional work on a reuse.[88]  But it is equally true that any reuse also required the use of Shen's Plans.  Indeed, Brighton admits that he had to use Shen's plans to the get the permits necessary to build additional homes using Brighton's designs.[89]  Essentially, Brighton would not have received any additional reuse fees had he not used Shen's Plans.

Despite his need for and his use of Shen's Plans to generate his reuse fees, Brighton suggests that no part of those fees should be paid to Shen.  Brighton argues that this is appropriate because Shen "did not earn any additional compensation" because it did not perform any additional work or provide any additional value beyond the creation of the Plans.[90]

But the Court need not weight these arguments because Shen's unjust enrichment claim is preempted.  Indeed, there is substantial case law that holds that unjust enrichment claims, such as the one brought by Shen, are preempted by

---

[87]   (*See id.*)

[88]   Notably, Shen has not responded to any of Brighton's unjust enrichment arguments. (*See* Pl's Reply, ECF No. 32.)

[89]   (*See* Def's App'x, ECF No. 30-1, Ex. 1 (Brighton Dep.) at 25:24–26:6 (acknowledging that Shen was to prepare drawings and other explanations that would be submitted in conjunction with Brighton's designs "so that he could get building permits for houses").)

[90]   (*See* Opp'n, ECF No. 30, at 26.)

the Copyright Act.  *See, e.g., Ehat v. Tanner*, 780 F.2d 876, 877-79 (10th Cir. 1985)

(reversing district court and concluding that Utah state law claims, including claim

for unjust enrichment, were preempted under the Copyright Act); *R.W. Beck, Inc. v.*

*E3 Consulting, LLC*, 577 F.3d 1133, 1146 (10th Cir. 2009) (holding unjust

enrichment claim preempted and noting that preemption applies where: "(1) the

work is within the scope of the subject matter of copyright as specified under 17

U.S.C. §§ 102 and 103; and (2) the rights granted under state law are equivalent to

any exclusive rights within the scope of federal copyright as set out in 17 U.S.C.

§ 106") (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847

(10th Cir. 1993) (cleaned up)); *see also Two Palms Software, Inc. v. Worldwide*

*Freight Mgmt., LLC*, 780 F. Supp. 2d 916, 923 (E.D. Mo. 2011) (finding preemption

where the gist of the unjust enrichment claim was the defendants' unauthorized use

of the copyrighted works).

At oral argument, counsel for both Shen and Brighton initially conceded that

the presence of an actionable copyright claim preempts Shen's state law unjust

enrichment claim.  Later in the argument, however, Shen's counsel suggested that

the claim might not be preempted because Brighton used Shen's Plans to get

permits for other homesites and represented (inappropriately) that Shen had

prepared and created the presented Plan for that specific site.  Even if such an

allegation could avoid the preemption bar (and it is not clear it could), the unjust

enrichment claim alleged in the Amended Complaint contends that Brighton

received a benefit "by making copies of Shen's work without Shen's authorization"[91]

Because such a claim is the equivalent of a Copyright Act violation, Shen's unjust

enrichment claim is preempted.  *See R.W. Beck,* 577 F.3d at 1148 (noting that

claims that defendant copied and used plaintiff's copyrighted work are "rights

equivalent to rights under the Copyright Act").[92]

### D.  Damages

At oral argument, the Court asked Shen's counsel to confirm his copyright

infringement damages calculation.  Counsel confirmed that that the damages he

sought were presented in his motion and represented 50% of his normal fee for each

of the 31 unauthorized reuses.[93]  The total for these damages is $36,900.[94]  Brighton

has not challenged Shen's calculation, other than to suggest that because Brighton

charged a reuse fee of 16% of his normal fee Shen's reuse fees should be the same.

But Shen has presented record evidence that his normal reuse fee is 50% and

---

[91]   (*See* ECF No. 7 at ¶64.)

[92]   At oral argument the Court raised the issue of whether Shen's state law claim of
breach of contract is similarly preempted, as it is also based on a claim that Brighton made
unauthorized copies and uses of Shen's Plans.  (*See* First Am. Compl., ECF No. 7, at ¶¶60–
61.)  While Shen's counsel did not concede that Shen's breach of contract is also subject to
preemption, he did assert that the claim was offered as an alternative to Shen's copyright
claim and sought the very same damages.  Accordingly, given the Court's ruling granting
Shen summary judgment on his copyright claim, the Court will dismiss Shen's breach of
contract claim without prejudice.

[93]   (*See also* Mot, Ex. A, ECF No. 27-1 (Shen Decl.) at ¶20; Mot., ECF No. 27, at 4 ¶20.)

[94]   (*See id.* at ¶20 (identifying the 31 reuses, applying the 50% discount to each, and
adding the same).  Examining these calculations, however, it appears that Shen made a
simple arithmetical error in his calculation and that his 50% discount results in damages of
$36,900 rather than $36,650.  The Court will therefore reference the correct calculation.

Brighton has not presented any counter evidence as to what an appropriate and accepted structural engineering reuse fee is or should be.  In any event, because Shen has not moved for summary judgment on damages, the Court will not rule on this issue at this time.[95]

<div align="center">CONCLUSION</div>

Accordingly, based on the foregoing,

IT IS ORDERED that Plaintiff's Motion[96] is GRANTED IN PART insofar as the Court GRANTS summary judgment to Plaintiff on its copyright infringement claim on the issue of liability, and DENIES summary judgment as to Plaintiff's unjust enrichment claim because such claim is preempted; and

IT IS FURTHER ORDERED that because Plaintiff's alternative breach of contact claim is mooted by the Court's ruling on Plaintiff's Copyright Act claim, that claim is dismissed without prejudice; and

IT IS FURTHER ORDERED that the parties are directed to brief the issue of whether there remain any genuine issues of disputed fact concerning the calculation of Plaintiff's copyright infringement damages.  Plaintiff's brief on this issue is due within 30 days of the date of this Decision and Order.  Defendant's response is due

---

[95]     While the Court is inclined to find that Shen is entitled to damages, at oral argument Shen's counsel noted that "we can do damages after" summary judgment on liability.  Thus, a finding on damages must await another day.

[96]     (ECF No. 27.)

within 30 days after service of Plaintiff's brief.  There will be no reply.  All briefs are limited to 10 pages exclusive of any declarations; and

IT IS FURTHER ORDERED that the parties are directed to file their respective briefs, which may not be more than 10 pages, on whether Plaintiff's Lanham Act claim is preempted under the Copyright Act, whether that claim remains viable following this Court's ruling on Shen's Copyright Act claim, and their views on how the Court should proceed on that sole remaining claim.  The parties must do so within 30 days of the date of this Decision and Order.  After receipt and review of the parties briefing on both the Lanham Act claim and on copyright damages, the Court may convene a hearing or may rule based on the parties' submissions.

DATED this 6th day of September 2024.

BY THE COURT:

_____

Ann Marie McIff Allen
United States District Judge